Filed 10/8/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| FRANCISCO GONZALES, | B282377 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC536584) |
| v. | |
| SAN GABRIEL TRANSIT, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maren E. Nelson, Judge.  Reversed and remanded with directions.

Law Offices of Thomas W. Falvey, Thomas W. Falvey, Armand R. Kizirian and Michael H. Boyamian for Plaintiff and Appellant.

Dunn DeSantis Walt & Kendrick, James A. McFaul, Bradley A. Lebow and Kevin V. DeSantis for Defendants and Respondents.

Appellant Francisco Gonzales formerly worked as a driver for respondent San Gabriel Transit, Inc. (SGT), a company that coordinates with public and private entities to arrange transportation services for passengers. In February 2014, Gonzales filed this putative class action seeking to represent over 550 drivers engaged by SGT as independent contractors from February 2010 to the present. Among other things, Gonzales alleged that by misclassifying drivers as independent contractors, SGT violated various provisions of the Labor Code[1] and the Industrial Welfare Commission's (IWC) wage orders,[2] particularly Wage Order No. 9-2001 (codified at Cal. Code Regs., tit. 8, § 11090 [Wage Order No. 9]), which governs the transportation industry, and engaged in unlawful business practices under Business and Professions Code section 17200 (17200). The trial court did not evaluate individual causes of action. Rather, analyzing the action as a whole, premised on terms contained in several lease agreements in effect during the class period, the court found that Gonzales failed to demonstrate the requisite community of interest or typicality among SGT drivers under the then—prevailing legal test, and denied the motion for class certification.

While this appeal was pending, the California Supreme Court decided *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903

---

[1] Unspecified statutory references will be to the Labor Code.

[2] The IWC is the state agency empowered to regulate wages, hours and fundamental working conditions for California employees through wage orders governing specific industries and occupations. (See *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1027 (*Brinker*).) IWC Wage Order No. 9 regulates wages, hours, and working conditions in the transportation industry. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 795.)

(*Dynamex*), in which it adopted the "ABC test" used in other jurisdictions to streamline and provide consistency in analyzing the distinction between employees and independent contractors for purposes of wage order claims.[3] We conclude that: (1) the ABC test adopted in *Dynamex* is retroactively applicable to pending litigation on wage and hour claims; (2) the ABC test applies with equal force to Labor Code claims that seek to enforce the fundamental protections afforded by wage order provisions; and (3) statutory claims alleging misclassification not directly premised on wage order protections, and which do not fall within the generic category of "wage and

---

[3] IWC wage orders "are constitutionally authorized, quasi-legislative regulations that have the force of law. (See Cal. Const., art. XIV, § 1; Lab. Code, §§ 1173, 1178, 1178.5, 1182, 1185; *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 700-703.)" (*Dynamex, supra,* 4 Cal.5th at p. 914, fn. 3.) Given the quasi-legislative nature of IWC's authority, courts afford great deference to the IWC's expressions of intent in enacting wage orders, and repeatedly have enforced definitions the IWC has deemed necessary to make wage orders effective. (*Martinez v. Combs* (2010) 49 Cal.4th 35, 61 (*Martinez*); see *Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 561 (*Nordquist*); see also *Dynamex*, at pp. 915-916, 942 [reimbursement claims under section 2802, which enforces specific requirements directly set forth in the wage orders].)

However, wage orders are not statutes and are not independently actionable. (See *Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal.App.4th 1112, 1131–1132 (*Thurman*), disapproved on other grounds by *ZB, N.A. v. Superior Court of San Diego County* (Sept. 12, 2019) __ Cal.5th ___, ___, fn. 8; 2019 WL4309684 *10].) Rather, wage order obligations are imposed by Labor Code provisions requiring compliance with wage orders, most of which do not define "employer" (*Thurman,* at p. 1132), and IWC definitions are imported into the Labor Code provision. (See *Martinez, supra*, 49 Cal.4th at p. 64 [IWC employer definitions govern Labor Code section 1194, which creates private right of action to enforce minimum wage]; cf., *Brinker, supra,* 53 Cal.4th at p. 1027 ["[t]o the extent a wage order and a statute overlap, [courts] will seek to harmonize them"].)

3

hour laws," are appropriately analyzed under what has commonly been known as the "*Borello*" test (referring to *S.G. Borello and Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 (*Borello*)).[4]

Because the trial court did not have the benefit of the *Dynamex* decision, we reverse and remand the matter with directions. On remand, the trial court shall: (1) evaluate which alleged Labor Code claims enforce wage order requirements, and which do not; (2) as to the Labor Code claims that enforce wage order requirements, apply the ABC test as set forth in *Dynamex* to determine whether the requirements of commonality and typicality for purposes of certification of a class action are satisfied; (3) as to the Labor Code claims that do not enforce wage order requirements, apply the *Borello* test to determine whether the requirements of commonality and typicality for purposes of certification of a class action are satisfied; (4) as to the derivative claim under section 17200, apply the ABC or *Borello* test as appropriate for the underlying alleged unlawful business practice; and (5) in the event the court determines class certification is appropriate for any claims, complete

---

[4]    We note that shortly before this decision was filed, the Governor signed Assembly Bill 5 (AB5) (added by Stats. 2019, ch. 296, § 1). It becomes effective January 1, 2020. AB5 states "It is the intent of the Legislature in enacting this act to [amend the Labor Code to add section 2750.3 and to amend section 3351 to] codify the decision of the California Supreme Court in Dynamex . . . [¶] [and] . . . to ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law, including a minimum wage . . . . By codifying the California Supreme Court's landmark, unanimous Dynamex decision, this act restores . . . important protections to potentially several million workers who have been denied . . . basic workplace rights that all employees are entitled to under the law." (*Id.*, at section (1), subds. (d) & (e).) Though it appears our decision in this case is consistent with AB5, we decide this case independently of that enactment.

4

the analysis by determining whether proceeding as a class action would be superior to alternative methods of adjudication.

## FACTUAL AND PROCEDURAL BACKGROUND

I.    *The Action*

In the operative first amended complaint, Gonzales alleges that he and a similarly situated class of SGT's drivers during the four years immediately preceding and during the pendency of this action were misclassified as independent contractors in violation of the Labor Code, administrative regulations and wage order provisions, and that SGT engaged in unfair business practices.[5]

Specifically, Gonzales alleged causes of action for (1) unpaid wages (§ 1194); (2) failure to pay minimum wage (§§ 1194, 1194.2); (3) failure to pay overtime compensation (§§ 1194, 510); (4) failure to provide meal and rest breaks (§§ 226.7, 512); (5) failure to furnish accurate wage statements (§ 226); (6) waiting time penalties (§§ 201-203); (7) failure to reimburse business expenses (§ 2802, 226.8; Wage Order No. 9(B); (8) common law conversion; (9) unfair business practices (§ 17200); (10) misclassification as independent contractor (§ 226.8); (11) recovery for unlawful wage deductions (§§ 221, 223); (12) conversion (§ 450); and (13) accounting.[6]

---

[5]    Although just one cause of action specifically alleges violation of a wage order, the complaint as a whole contains broad allegations of wage order violations, particularly Wage Order No. 9.  As discussed below, some alleged Labor Code claims, if established, would also constitute wage order violations.

[6]    On appeal, Gonzales does not challenge the trial court's ruling as it relates to his common law claim for conversion or his common count for an

5

In January 2016, Gonzales filed a motion seeking class certification for approximately 560 members of a class defined as "[a]ll non-employee Drivers, or Lessees, of [SGT] from February 14, 2010 to the present (the class period) who drove a taxicab or van and paid [SGT] a weekly vehicle lease." Alternatively, Gonzales proposed certification of three subclasses:

> *Subclass A*: All non-employee Drivers, or Lessees, of SGT from February 14, 2010 to the present who drove a taxicab or van, paid SGT a weekly lease, and transported passengers in connection with Access Paratransit Services, Inc.

> *Subclass B*: All non-employee Drivers, or Lessees, of SGT from February 14, 2010 to the present who drove a taxicab or van, paid SGT a weekly vehicle lease, and transported school children in connection with a school route; and

> *Subclass C*: All other non-employee Drivers, or Lessees, of SGT from February 14, 2010 to the present who drove a taxicab or van and paid SGT a weekly vehicle lease.

The trial court denied the motion for class certification. Because we reverse the trial court's ruling and remand the case for reconsideration, we summarize only those details necessary to make our remand instructions clear.

II. *SGT's Business During the Class Period*

SGT is a transportation company which facilitates traditional taxicab passenger service. In addition, SGT maintains "house accounts," i.e., service contracts with school districts, cities and private entities (such as movie

accounting, the 8th and 13th causes of action, respectively. He has thus forfeited any such challenge.

studios and hotels), to arrange transportation services for passengers. SGT also coordinates with Access Paratransit Services, Inc. (Access), to provide paratransit services for some individuals with disabilities,[7] and with LA Taxi Cooperative, Inc., dba Yellow Cab Co (LA Taxi), to provide drivers for school routes for students with special needs in various school districts. SGT's drivers may drive Access or school routes, service house accounts, transport passengers from Los Angeles International Airport (LAX) or within specific geographic areas, or perform some combination of these services.

A. *Taxi Service*

With respect to taxi passenger service during the class period, SGT used various overlapping models and written agreements with its drivers. From February 2010 until January 2013, SGT: (1) entered into various written agreements by which it "leased" taxicabs and equipment to drivers, (2) operated general dispatch services, and (3) provided insurance, marketing and other industry-related services to taxicab drivers who leased vehicles or were owner-operators for general passenger services. Driver eligibility required a valid California driver's license and no special training. Beginning in January 2013, SGT operated two general taxicab dispatch services, available on differing bases, depending on whether the driver operates a Bell Cab leased from SGT.

---

[7] Access is a non-profit public benefit corporation formed by the Los Angeles regional transportation planning authority and the Consolidated Transportation Service Agency for Los Angeles County. Access facilitates the provision of paratransit services to individuals with disabilities who are unable to use other accessible public transportation.

7

Drivers could obtain passengers by "cash call" offers through SGT's dispatch service, being hailed down in the street, waiting at sanctioned taxicab stands, or by fostering personal relationships with passengers who would contact the driver directly. SGT also made house account runs available to some drivers. Drivers whose customers paid in cash did not share any portion of the fare or their tips with SGT. Drivers whose customers paid by credit card, voucher, or coupon agreed to pay SGT processing or administrative fees of up to 10 percent per fare.

B. *Access Service*

In February 2010, SGT began coordinating with Access to transport paratransit passengers. Access drivers must satisfy specific criteria not required of drivers who provide traditional taxicab service. These criteria, established by Access but enforced by SGT, include undergoing background checks and special training, wearing identification badges and uniforms (clothing and shoes of specified colors), and agreeing to abide by a code of conduct dictated by Access. Access determines fare rates for Access trips and pays SGT. SGT, in turn, pays drivers after deducting a 10 percent fee to cover SGT's "waiting time" cost—the time from when an Access trip is taken to when Access pays SGT for that trip.

C. *School Runs*

In coordination with LA Taxi, SGT also provides drivers for school runs for students with special needs in various school districts. To be eligible to service school runs, drivers must receive special training from LA Taxi, and agree to abide by LA Taxi rules, school district requirements and adhere to parental direction. LA Taxi sets the payment rate for school runs and pays

8

SGT directly. SGT then pays the driver, after deducting a 10 percent processing fee.[8]

### D. *LAX Service*

Drivers who choose to transport passengers from LAX must satisfy certain requirements and agree to comply with rules dictated by the Los Angeles Department of Transportation (LADOT), and abide by LAX franchise requirements. LAX drivers are dispatched to terminals by LAX employees, not SGT.

### E. *IRS 1099 Forms*

Before 2013, SGT did not issue IRS 1099 tax forms for drivers. In 2013, SGT began to issue 1099 forms which reflect only amounts paid to drivers by credit card and by Access. SGT has never issued W-2 forms for drivers.

### III. *SGT's Contractual Agreements with Drivers*

The trial court's ruling is predicated heavily on distinctions between the terms of several written agreements between SGT and drivers in effect during the class period. It is sufficient here to state that the appellate record contains five distinct "lease" agreements between SGT and its drivers which differ in some respects as to the duties and obligations imposed on the drivers and SGT, but all the agreements identify drivers as independent contractors.

---

[8] According to an unwritten SGT policy, Access and school route drivers may avoid paying the 10 percent processing fee if they are willing to wait up to 60 days to be paid, until SGT has been paid by Access or LA Taxi.

IV. *Gonzales's Relationship with SGT*

Gonzales drove for SGT during intermittent periods from mid-2005 to September 2012. Over this period, he used five different vehicles. He leased one cab from SGT, purchased three others, and subleased a fifth car from a coworker. Gonzales always considered himself an employee of SGT, and understood that his weekly "lease" payments ensured that he would continue to receive work from SGT. At first Gonzales provided traditional taxicab passenger service, but at some point he began driving Access routes almost exclusively. Gonzales alleged that, as an Access driver, SGT assigned him specific routes for passenger pick-up and drop-off, and he was not permitted to decline nor deviate from those assignments. He also alleged that he was required to pay out of pocket for, among other things, radio service to maintain contact with SGT's dispatch, fuel, maintenance and repairs for his vehicle and his uniform, and was required to paint his cab the specific colors of and display the logo of at least one cab company.

Gonzales claims he typically worked 12-hour days, six days per week, and was not provided nor compensated for meal or rest breaks. His schedule was dictated almost entirely by his Access routes, and he lacked discretion to alter those routes without risking a loss of business. Gonzales did not drive LAX or school routes.

V. *Declarations of Other Drivers*

Gonzales presented 17 former coworkers' declarations in support of the motion. A general summary of that testimony reflects that:

> *Hiring Process and Training*: When they were hired, drivers signed an agreement stating they were independent contractors, not employees, and were required to undergo background checks and present their driving records to SGT.

10

*Uniforms*:  Most drivers were required to wear a uniform (or at least clothing and shoes of specified colors).

*Suspension*:  Drivers could be "suspended" if they got into a traffic accident.  If a driver refused to take a passenger or declined to accept more routes, he or she would not be "suspended," but faced the risk of losing favor with dispatchers—and the concomitant risk of a decrease in future business.

*Meal and Rest Breaks*:  SGT had no policy regarding meal or rest breaks, and drivers received neither.

*Discipline*:  Several declarants were regularly summoned to SGT's administrative office due to customer complaints, and told they could be fired if future incidents occurred.  Some drivers testified they were or could be fired for refusing Access routes.  One driver said SGT fired him after he refused to violate his own and Access' safety guidelines.

## VI.    *SGT's Opposition to the Motion*

Primarily through the testimony of Stacey Murphy, its Manager of Operations, SGT presented evidence that its "independent drivers" are free to work when and where they please, and to acquire business where and as they choose.  Drivers may receive referrals through SGT's dispatch service, or generate their own business through personal relationships, flag downs, by waiting at taxi stands or through regular house accounts.  Eligible drivers may acquire business through Access, LAX service and/or school runs.  SGT does not tell drivers when to work, and does not impose any "rules, policies or procedures" on its independent drivers.

Murphy testified that drivers must pay a weekly "lease" fee to cover insurance and maintenance, plus a processing fee of up to 10 percent per fare for credit payments.  Some drivers skirt the latter contractual requirement and avoid paying SGT's 10 percent processing fee by using an alternate method to process credit payment (such as their own "Square" accounts).  Drivers keep fares and tips for cash-paying customers, and do not report those amounts to or share them with SGT.

11

According to Murphy, some drivers lease vehicles from SGT, individuals or other entities, others own their cabs, and others share vehicles and negotiate cost-sharing agreements with other drivers. All of SGT's lease agreements specify that SGT or a driver may terminate the agreement for a specified or no reason, subject to certain notice restrictions.

SGT presented declarations from more than 55 current drivers to demonstrate that some drivers:

(1)  use SGT's dispatch service for all or some routes, while others use the dispatch service only for Access routes;
(2)  choose to drive Access routes; others do not;
(3)  choose to drive LAX passengers;
(4)  develop personal relationships with passengers who contact them directly;
(5)  choose to drive school runs for LA Taxi; and
(6)  pick up passengers who hail cabs; others do not.

Most of SGT's declarants said they understood they were independent contractors, and did not wish to be treated as employees.

VII.  *The Trial Court's Ruling*

The trial court denied the motion. Addressing the complaint as a whole, the court found that Gonzales demonstrated the existence of an ascertainable and sufficiently numerous class, and that he and his counsel were adequate class representatives. However, the trial court found that Gonzales failed to make the requisite showing that the issue of misclassification as an independent contractor (either as to the proposed class or three proposed subclasses of drivers) was susceptible to common proof.

12

A.  *Lack of Commonality Among Class Members—Single Class*

As to whether to certify a single class, the trial court found that the class claims were not subject to common proof primarily because, during the class period, SGT's drivers worked under several different lease agreements, among which the terms on various topics differed (e.g., inspection requirements, leased versus driver-owned vehicles, routes driven, lease termination, and necessity of the driver wearing a uniform).  The court also found variations in "rules and regulations" imposed on drivers and the level and type of training required, and found insufficient common evidence that SGT used its dispatch service to control drivers or dictate their work hours.  Moreover, the court concluded that the drivers' rates and manner of compensation were not entirely within SGT's control.

Finally, implicit in the trial court's ruling was its disapproval of Gonzales' proposed trial plan.  The court noted that Gonzales failed to specify how he planned to use expert testimony.  Also, issues of credibility among some of Gonzales' declarants, would likely require "mini trials" about those drivers' singular experiences.

B.  *Lack of Commonality Among Class Members—Sub-Classes*

The trial court also found insufficient common evidence regarding misclassification if drivers were divided into the three proposed subclasses.

As for Subclass (A)[9] the court found that Gonzales failed to establish by substantial evidence that all Access drivers were misclassified as

---

[9]     "All non-employee Drivers, or Lessees, of [SGT] from February 14, 2010 to the present who drove a taxicab or van, paid [SGT] a weekly lease, and transported passengers in connection with Access."

independent contractors or subject to a right of control by SGT. Further, SGT presented evidence to show that drivers were free to choose whether to drive Access routes at all, and to accept or decline such routes at will.

The court found Subclass (B)[10] not certifiable because, among other things, Gonzales, the sole named plaintiff, never drove a school route for SGT. The court found Subclass (C)[11] overbroad

### C. *Lack of Typicality*

The court also found that Gonzales failed to establish typicality among the class members' claims, i.e., that he and others sought recovery for the same or substantially similar injuries arising from a common course of conduct. First, the court determined that Gonzales's position with SGT varied from 2005 to 2012, as he had both leased and purchased taxicabs from SGT. Second, although Gonzales provided traditional taxicab services (without a set schedule or hours) at first, he was later assigned to Access routes with designated schedules which typically required him to work up to 14 hours per day, six days per week, without meal or rest breaks and was required to wear a uniform. Third, Gonzales did not perform school or LAX routes. Finally, the court found that Gonzales failed to establish typicality because he was unable to show that SGT exercised the same degree of control

---

[10] "All non-employee Drivers, or Lessees, of [SGT] from February 14, 2010 to the present who drove a taxicab or van, paid [SGT] a weekly vehicle lease, and transported school children in connection with a school route."

[11] "All other non-employee Drivers, or Lessees, of [SGT] from February 14, 2010 to the present who drove a taxicab or van and paid [SGT] a weekly vehicle lease."

14

over its drivers.  While Gonzales and some of his declarants claimed they were required to adhere to specific work schedules and route assignments, other drivers said they were free to choose their own work hours and routes.

## DISCUSSION

Gonzales contends that the trial court erred in concluding that his proposed class or subclasses lacked sufficient commonality, and that his claims are not typical of the putative class members.  Based on *Dynamex, supra,* 4 Cal.5th 903, decided by our Supreme Court during the pendency of this appeal, we conclude that we must remand the case to the trial court for reconsideration.

I.  *Standard of Review and Requirements for Class Certification*

The requirements for class certification are well established.  "'The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.  [Citations.]  ". . . the 'community of interest requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class."'"  (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 529 (*Ayala*), quoting *Brinker, supra,* 53 Cal.4th at p. 1021.)  California law "'encourages the use of the class action device.'  [Citation.]"  (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 340 (*Sav-On*).)  The "predominant common questions" factor does not require that all class members have identical claims.  Rather, the focus is on whether issues

shared by the class members are sufficiently uniform to permit class-wide assessment, and whether individual variations in proof on those issues are manageable. (*Ayala,* at p. 530.)

"The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.'" (*Sav-On, supra,* 34 Cal.4th at p. 326.) "A class certification motion is not a license for a free-floating inquiry into the validity of the complaint's allegations; rather, resolution of disputes over the merits of a case generally must be postponed until after class certification has been decided [citation], with the court assuming for purposes of the certification motion that any claims have merit." (*Brinker, supra,* 53 Cal.4th at p. 1023.) Still, whether common or individual questions predominate often depends on resolution of issues closely tied to the merits. (*Id.* at p. 1024.) Phrased another way, "a trial court must examine the plaintiff's theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate. To the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them." (*Id.* at p. 1025.)

"Courts regularly certify class actions to resolve wage and hour claims." (*Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1208, disapproved on another ground by *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 986, fn. 15; see *Brinker, supra,* 53 Cal.4th at p. 1033.) Indeed, the California Supreme Court has held that a theory of liability that a hiring entity "has a uniform policy, and that that policy, measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment." (*Brinker,* at p. 1033.) We review a trial court order denying a motion for class certification for abuse of

16

discretion, and generally will not disturb that decision "'"unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.'" [Citation.]" (*Ayala, supra,* 59 Cal.4th at p. 530; see *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 49 (*Duran*); *Brinker,* at p. 1022.)

In class actions, California courts may look to federal rules on procedural matters. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 469, fn. 7 [looking to Fed. Rules Civ. Proc., rule 23 (Rule 23)]; *Williams v. Superior Court* (2013) 221 Cal.App.4th 1353, 1364.) Under that framework, at the class certification stage, the focus is *not whether* a sufficient number of *common questions* have been raised. Rather, the thrust of the inquiry is the capacity of a class-wide proceeding to generate common *answers* apt to drive resolution of the litigation. (Rule 23(a)(2); *Wal-Mart Stores, Inc. v. Dukes* (2011) 564 U.S. 338, 350 (*Dukes*); *Duran, supra*, 59 Cal.4th at p. 28 [same].)

We review the trial court's actual reasons for denying certification; if they are erroneous we must reverse, even if other reasons on which the court did not rely may have supported the same ruling. (*Linder, supra*, 23 Cal.4th at pp. 435-436.) As the California Supreme Court recently explained, the "question of what legal standard or test applies in determining whether a worker is an employee or, instead, an independent contractor for purposes of the obligations imposed by a wage order is . . . a question of law." (*Dynamex, supra,* 4 Cal.5th at p. 942, fn. 16; cf., *Martinez, supra,* 49 Cal.4th at pp. 57-60.) "[I]f the trial court applied the wrong legal standard and that error affected the propriety of its class certification ruling, the order denying decertification would constitute an abuse of discretion." (*Dynamex,* at p. 942, fn. 16; *Sav-On, supra*, 34 Cal.4th at p. 339, fn. 10.)

17

In California, in the context of class actions seeking a determination of whether a category of workers has been misclassified as independent contractors, courts have examined whether sufficient evidence exists of a uniform right of control to resolve the issue of misclassification on a class-wide basis. (See, e.g., *Ayala, supra*, 59 Cal.4th at pp. 530-540.) "As part of the community of interest requirement, the party seeking certification must show that issues of law or fact common to the class predominate. [Citation.]" (*Duran, supra*, 59 Cal.4th at p. 28.) Before certifying a class, the trial court need not resolve all legal disputes concerning the elements of plaintiff's claims to determine whether common questions predominate. (*Brinker, supra,* 53 Cal.4th at p. 1038.) "The 'ultimate question' . . . is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.'" (*Id*. at p. 1021.) In conducting this analysis, a "court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.'" (*Id*. at p. 1021-1022, fn. omitted.)

## II. *Dynamex*

In *Dynamex, supra*, 4 Cal.5th at pages 927-943, our Supreme Court conducted an exhaustive review of the evolution of the test for distinguishing employees from independent contractors, and how that distinction is applied

18

in the context of California wage orders.  We summarize the principles as necessary to our disposition of this appeal.

A.  *The Borello Test and Ayala's Refinement of that Test*

Under California law, an individual who provides services for another is presumed to be an employee.  (§ 3357 ["Any person rendering service for another, other than as an independent contractor, or unless expressly excluded herein, is presumed to be an employee"]; *Robinson v. George* (1940) 16 Cal.2d 238, 243.)  From this threshold, the burden is on an employer to "prove, if it can, that the presumed employee was an independent contractor." (*Narayan v. EGL, Inc.* (9th Cir. 2010) 616 F.3d 895, 900.)  For decades, California courts have applied the test articulated in *Borello, supra,* 48 Cal.3d 341, to determine whether a worker is an employee or an independent contractor.  (*Id*. at pp. 351, 353-354, 357-359; *Ayala, supra*, 59 Cal.4th at p. 522.)

Under *Borello,* ""'[t]he principal test of an employment relationship [was] whether the person to whom service is rendered ha[d] the *right to control the manner and means of accomplishing the result* desired.""'  (*Ayala, supra*, 59 Cal.4th at p. 531, quoting *Borello, supra*, 48 Cal.3d at p. 350, italics added.)  *Ayala* reaffirmed and clarified application of the *Borello* test for Labor Code violations by evaluating several "secondary indicia" which inform the task of classifying workers as employees.  (*Ayala,* at p. 532.)  They are: "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the

19

instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Ibid.*; *Borello*, at p. 351.) These "'individual factors cannot be applied mechanically as separate tests; they are intertwined, and their weight depends often on particular combinations.' [Citation.]" (*Borello*, at p. 351; but see *Ayala*, at p. 539 ["the skill which is required in the occupation is often of almost conclusive weight"].) Moreover, the label parties attach to their relationship "is not dispositive and will be ignored if their actual conduct establishes a different relationship." (*Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 10–11; *Borello*, at p. 349 [an affirmative agreement to classify a worker in one way may be considered, but "is not dispositive, and subterfuges are not countenanced"].)

In *Ayala*, plaintiffs proceeded on the sole basis that they were employees, and the Court resolved the case applying the *Borello* test for employment. (*Ayala, supra*, 59 Cal.4th at p. 531.) The Court confined itself to determining whether plaintiffs' theory that they were employees under the common law definition was susceptible of proof on a class-wide basis, and left "for another day the question of what application, if any, the wage order tests for employee status might have to wage and hour claims." (*Id.* at p. 531; *Dynamex, supra*, 4 Cal.5th at p. 941.)

### B. *Martinez—Wage Order Claims*

In *Martinez, supra*, 49 Cal.4th 35, the Supreme Court resolved the standard to be applied in determining whether workers should be classified

20

as employees or independent contractors for purposes of California wage order claims. (*Martinez,* at pp. 52–57; *Dynamex, supra*, 4 Cal.5th at p. 936.)

In *Martinez*, seasonal farm laborers sued the grower (which indisputably employed them), and the merchants to whom the grower regularly sold its produce, for failure to pay minimum or overtime wages. The workers argued that, in an action to recover unpaid wages under section 1194, the alternative definitions of "employ" and "employer," as used in the applicable wage order (there Wage Order No. 14), established the standard for determining whether both the grower and the merchants should be considered employers, jointly liable for workers' unpaid wages. (*Martinez, supra*, 49 Cal.4th at pp. 42-50.) The Court discussed at length the impact of the IWC regulatory scheme on whether a joint employment relationship arose between the farm workers and merchants. (See *Martinez* at pp. 52–57.) Although the Court concluded that no joint employer relationship was formed, it clarified that IWC wage orders are accorded the same weight as statutes and the applicable wage order defines the employment relationship for wage and hour claims within its scope. (*Id.* at pp. 52, 61.)

After examining the statutory and historical context of section 1194, the *Martinez* Court concluded that the wage order encompassed three alternative definitions of the term "employ." (*Martinez, supra*, 49 Cal.4th at p. 64.) To employ "means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Id.* at pp. 64, 57–58; see Cal. Code Regs., tit. 8, § 11090, subd. 2(D); see also *Dynamex, supra*, 4 Cal.5th at p. 937 [the same definition of "employ" applies to Wage Order Nos. 9 and 14].)

21

C.       *"Another Day" Arrives—the Dynamex ABC Test for Wage Orders*

The *Ayala* Court expressly left "for another day the question of what application, if any, the wage order tests for employee status might have to wage and hour claims." (*Ayala, supra*, 59 Cal.4th at p. 531; *Dynamex, supra*, 4 Cal.5th at p. 941.)  That day arose in *Dynamex,* which resolved the principal question at issue here, "namely whether in a wage and hour class action alleging that the plaintiffs have been misclassified as independent contractors when they should have been classified as employees, a class may be certified based on the wage order definitions of 'employ' and 'employer' as construed in *Martinez, . . .* or, instead, whether the test for distinguishing between employees and independent contractors discussed in *Borello . . .* is the only standard that applies in this setting." (*Dynamex,* at pp. 941-942.)[12]

In *Dynamex*, delivery drivers alleging they had been misclassified as independent contractors, brought a wage and hour lawsuit seeking overtime pay, reimbursement of business expenses, and other claims.  (*Dynamex,* at p.

---

[12]       In *Dynamex,* the Court observed that *Borello* is frequently characterized "as embodying the *common law* test . . . for distinguishing employees and independent contractors [citation]." (*Dynamex, supra*, 4 Cal.5th at p. 934, italics added.)  But the Court explained it was more precise to describe *Borello* "as calling for resolution of the employee or independent contractor question *by focusing on the intended scope and purposes of the particular statutory provision or provisions at issue*[,]" because in *Borello* the court "repeatedly emphasize[d] statutory purpose as the touchstone for deciding whether a category of workers should be considered employees for purposes of social welfare legislation." (*Id*. at pp. 934-935, italics added.)  "In other words, *Borello* calls for application of a *statutory purpose* standard that considers the control of details and other potentially relevant factors . . . in order to determine [whether classification as employee or independent contractor] best effectuates the underlying legislative intent and objective of the statutory scheme at issue." (*Id*. at p. 934.)

942.)  With respect to the drivers' wage order claims, the Supreme Court held that, "the suffer or permit to work standard properly applies to the question whether a worker should be considered an employee or, instead, an independent contractor."  (*Id*. at p. 943.)  *Dynamex* next considered the appropriate test to resolve this question under the "suffer or permit to work" definition of "employ."  The Court rejected the *Borello/Ayala* multifactor test for this purpose, and instead adopted the "simpler, more structured" three-part "ABC" test used in Massachusetts and other jurisdictions.  (*Id*. at pp. 955–958, & fns. 23-26.)

In contrast to *Borello's* multifactor test, the ABC test permits "'courts to look beyond labels and evaluate whether workers are truly engaged in a separate business or whether the business is being used by the employer to evade wage, tax, and other obligations.'"  (*Dynamex, supra*, 4 Cal.5th at p. 958, fn. 26.)  Under the ABC test, a worker is presumptively an employee, and the hiring entity bears the burden to show otherwise.  (*Curry v. Equilon Enterprises, LLC* (2018) 23 Cal.App.5th 289, 313.)   The ABC test is conjunctive, and the hiring entity's failure to establish *any* of the following three factors precludes a finding that the worker is an independent contractor:  "(A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed."  (*Dynamex,* at p. 957, adopting language of Massachusetts Wage Act, Mass. Gen. Laws, ch. 149, § 148B.)

23

Part A of the ABC test refines *Borello's* "right to control" test, as broadly defined in *Martinez*. (See *Dynamex, supra*, 4 Cal.5th at p. 958 ["as . . . *Martinez* makes clear . . . the suffer or permit to work definition was intended to be broader and more inclusive than the common law test"].) Under part A, a court determines whether class certification is appropriate by examining whether there is common proof of a hirer's right to control that would permit resolution of the misclassification issue on a class-wide basis. (*Ayala, supra*, 59 Cal.4th at pp. 530–540; *Ali v. U.S.A. Cab Ltd.* (2009) 176 Cal.App.4th 1333, 1344–1352.) The primary focus is not on the scope of actual control exercised by a business over "the precise manner or details of the work" performed, but on the broader question of the degree to which the hirer legally has retained, either as a matter of contractual right or in actual practice, the right of "necessary control" over the work, and the extent to which that scope of control—whatever it is—is subject to common proof. (*Dynamex,* at pp. 950-951, fn. 20, 958; *Ayala*, at p. 533.)

Part B of the ABC test requires a business to demonstrate "that the worker performs work that is outside the usual course of the hiring entity's business." (*Dynamex, supra*, 4 Cal.5th at pp. 917, 959.) This part of the test seeks "to bring within the 'employee' category *all* individuals who can reasonably be viewed as working '*in [the hiring entity's] business*' [citation], that is, all individuals who are reasonably viewed as providing services to the business in a role comparable to that of an employee, rather than in a role comparable to that of a traditional independent contractor. [Citation.]" (*Id.* at p. 959, italics added; see *Garcia v. Border Transportation Group, LLC* (2018) 28 Cal.App.5th 558, 569 (*Garcia*).) The focus is not on the label attached to a worker's position, but on how that individual's job may reasonably be viewed. "Workers whose roles are most clearly comparable to

24

those of employees include individuals whose services are provided within the usual course of the business of the entity for which the work is performed and thus who would ordinarily be viewed by others as working in the hiring entity's business and not as working, instead, in the worker's own independent business." (*Dynamex,* at p. 959.)

An employer fails to make the necessary showing under prong B if a court finds that the work performed is "'not "merely incidental to" [the company's] business, but rather, is an "integral part of" that business.' [Citation.]" (*Dynamex, supra*, 4 Cal.5th at p. 961, fn. 29.) To illustrate this point, the Court observed that a retailer who hires an outside plumber or electrician to fix a malfunctioning pipe or to install lighting "would not reasonably be seen as having suffered or permitted the plumber or electrician to provide services to it as an employee." (*Id*. at p. 959.) By contrast, a clothing manufacturer who hires work-at-home seamstresses to sew clothing the company intends to sell, using fabric and patterns supplied by the company, or a bakery that regularly hires decorators to decorate its custom designed cakes, would be considered an employer. (*Ibid*.) In the latter two examples, "the workers are part of the hiring entity's usual business operation and the [hirer] can reasonably be viewed as having suffered or permitted the workers to provide services as employees" and "the workers' role within the . . . usual business operations is more like . . . an employee than . . . an independent contractor." (*Id*. at p. 960.) Similarly, *Dynamex* pointed to a case in which a court found that a business failed to satisfy prong B where it was unable to demonstrate that workers' harvesting work was outside the usual course of business for a company engaged in the business of contracting for the purchase, harvesting, sale and delivery of cut timber to customers. (*Id*. at p. 961, fn. 29, citing Maine Supreme Court decision,

25

*McPherson Timberlands, Inc. v. Unemployment Ins. Com.* (1998) 714 A.2d 818, 821.)

Finally, to establish a worker is an independent contractor, part C of the ABC test requires the hiring entity to show that the worker is "customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity." (*Dynamex, supra*, 4 Cal.5th at p. 961.)  Here the inquiry is whether the worker "*independently* has made the decision to go into business for himself or herself." (*Id*. at p. 962.)  This factor is established with evidence that the worker has "take[n] the usual steps to establish and promote his or her independent business—for example, through incorporation, licensure, advertisements, routine offerings to provide the services of the independent business to the public or to a number of potential customers, and the like." (*Ibid*.)  Critically, part C requires the hirer to show a worker *actually be engaged* in an independent business, *not merely that he or she could be.* (*Id*. at p. 962 & fn. 30; *Garcia, supra*, 28 Cal.App.5th at pp. 573–574.)

Again, the ABC test is conjunctive, so a hiring entity's failure to satisfy any of the three prongs directs a finding that a "worker should be treated as an employee for purposes of the wage order." (*Dynamex, supra*, 4 Cal.5th at p. 963.)  Accordingly, "a court is free to consider the separate parts of the ABC standard in whatever order it chooses." (*Ibid*.)  If, at any point in the analysis, the court finds a business has failed to make a sufficient showing as to A, B or C, it need not analyze the remaining prongs.

III.    *Retroactive Application of Dynamex*

   A. *Wage Order Claims*

   On appeal, SGT states that it "does not concede that *Dynamex* applies retroactively to this matter," yet makes no substantive argument on the point.  Having failed substantively to address the issue, SGT has forfeited any claim that *Dynamex* is not retroactive.  (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177.)

   In any event, there is no reason to conclude that *Dynamex* departs from the usual rule of retroactive application.  Judicial decisions in civil litigation almost uniformly are given retroactive effect and applied to pending litigation.  (See e.g., *Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944, 967; *Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978; *Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 796; *Rose v. Hudson* (2007) 153 Cal.App.4th 641, 646.)  A rare exception is employed in extraordinary circumstances dictated by considerations of fairness and public policy, such as when a decision articulates a new standard or rule of law.  (See *Rose v. Hudson, supra*, 153 Cal.App.4th at p. 653, *Hoschler v. Sacramento City Unified School Dist.* (2007) 149 Cal.App.4th 258, 271.)  The instant litigation presents no extraordinary circumstance.  *Dynamex* did not establish a new standard.  Rather, its expressly articulated purpose was to streamline the existing complex, multifactor wage order analysis:  "In our view, this interpretation of the suffer or permit to work standard is faithful to its history and to the fundamental purpose of the wage orders and will provide greater clarity and consistency, and less opportunity for manipulation, than a test or standard that invariably requires the

27

consideration and weighing of a significant number of disparate factors on a case-by-case basis." (*Dynamex, supra,* 4 Cal.5th at p. 964.)[13]

### B.  *Labor Code Claims*

*Dynamex* did not reach the question of whether the ABC test applies to non–wage order related Labor Code claims.  (*Dynamex, supra*, 4 Cal.4th at p. 916, fn. 5 ["The drivers contend that the wage order definitions should apply to all the relief sought under [Labor Code] section 2802 . . . that issue is not before us and we express no view on that question"].)  Considering that question here, we conclude that the ABC test applies to Labor Code claims which are either rooted in one or more wage orders, or predicated on conduct alleged to have violated a wage order.  As to Labor Code claims that are not either rooted in one or more wage orders, or predicated on conduct alleged to have violated a wage order, the *Borello* test remains appropriate.

---

[13]  To date, one published decision has addressed retroactive application of *Dynamex.*  In *Garcia, supra,* 28 Cal.App.5th at page 572, the court observed that, at least as to wage order claims, "*Dynamex* changed the appropriate standard for determining whether [an individual is] an employee entitled to wage order protection, or an independent contractor who [is] not."  The comment is dicta.  *Dynamex* was decided after appellate briefing was complete in *Garcia*.  Although the court gave the parties an opportunity to brief the issue of retroactivity, they chose not to do so, and the court did not expressly resolve whether the rule articulated in *Dynamex* applied retroactively, but assumed implicitly that it would not.  (*Id*. at p. 565, and fn. 11 [applying *Dynamex* retroactively as to that case only because the defendant, which bore the burden to do so, never raised the issue].)  Further, we disagree with any suggestion that, for purposes of retroactivity, *Dynamex* established a new standard.  We take the Supreme Court at its word: *Dynamex* merely clarified and streamlined the analysis of the wage order "suffer or permit to work" test.  (*Dynamex, supra*, 4 Cal.5th at p. 964.)

Here, Gonzales specifically alleged violations of both the Labor Code and Wage Order No. 9 only in the seventh cause of action (for failure to reimburse business expenses in violation of section 2802). However, he generally alleges that SGT's misconduct violates both wage order protections and the Labor Code. The complaint opens with the general allegation that Gonzales and others "who drove for [SGT] . . . during the . . . ('Class Period'), . . . were denied the benefits and protections required under the California Labor Code *and other statutes and regulations applicable to California employees* because they were misclassified as independent contractors." (Italics added.) After listing specific wrongful acts and a host of SGT's alleged Labor Code violations, Gonzales alleges that this same misconduct violated "applicable Wage Orders issued by California's Industrial Welfare Commission, *including [Wage Order No. 9]* during the Class Period." (Italics added.)

Second, Wage Order No. 9 covers most of the Labor Code violations alleged. For example, the failure to pay minimum wages under section 1194, which (according to section 1197), is established in the wage orders and governed by Wage Order No. 9(4). Failure to provide meal or rest periods in violation of sections 512 and 516 is governed by Wage Order Nos. 9(11) and (12). The failure to supply accurate wage statements and records of hours worked in violation of section 226 is encompassed by Wage Order No. 9(7), and failure to reimburse expenses and improper deductions in violation of section 2802 is encompassed by Wage Order Nos. 9(8) and (9). Further, section 1198 makes unlawful "employment of any employee . . . under conditions of labor prohibited by the [wage] order."

Notwithstanding the close, if not inseparable, ties between these alleged Labor Code violations and wage order provisions, SGT insists the

order denying class certification must stand because Gonzales has not shown that common issues predominate under the ABC test.[14]  Such an approach would pose a significant practical problem, as it would require a trial court to apply one test to a wage and hour claim grounded solely in the Labor Code and a different test for essentially the same claim premised on a wage order. Employers/hirers and employees/independent contractors cannot determine their rights if they do not know what test applies.  Moreover, the suggestion that different tests govern statutory wage and hour claims is contrary to *Dynamex's* stated purpose of providing clarity and consistency in analyzing this thorny issue.  (See *Dynamex, supra*, 4 Cal.5th at p. 964.)

In a lawsuit such as this, a plaintiff seeks primarily to enforce provisions of the Labor Code which, by its own terms, incorporate the wage orders:  "[A]n employee who sues to recover unpaid minimum wages under section 1194 [of the Labor Code] actually sues to enforce the applicable wage order.  Only by deferring to wage orders' definitional provisions do we truly

---

[14]  SGT also insists the order denying class certification must stand, at least in part, because some claims are not predicated on violations of a wage order.  Specifically, SGT contends that alleged violations of sections 1194 and 510 (for failure to pay overtime), sections 201–203 (waiting time penalties), and section 2802 (failure to reimburse business expenses), must be analyzed under *Borello,* as should any alleged violation of section 17200 premised on those claims.

We recognize that some statutory claims may not be encompassed by, or are expressly excluded from, wage order protection.  For example, the overtime protections of Wage Order No. 9 do not apply to taxicab drivers. (See Wage Order No. 9(3)(M).)  However, Access or school route drivers may not be considered "taxicab drivers" (an undefined term), but may nevertheless be subject to another exception.  (See e.g., Wage Order No. 9(3)(L).)  We leave it to the trial court on remand to resolve this—and similar issues—on a more complete record.

30

apply section 1194 according to its terms by enforcing the 'legal minimum wage.'" (*Martinez, supra*, 49 Cal. 35 at p. 62.) Indeed, this is what happened in *Dynamex* where plaintiffs alleged Labor Code violations based on Dynamex's failure to comply with specific wage order requirements. (*Dynamex, supra,* 4 Cal.5th at pp. 941–943.) Given that pleading and the fact that wage orders establish basic requirements for such things as wages, hours and working conditions, the Supreme Court's holding that the ABC test should be applied to determine employee status under the wage orders can only mean that the same test applies to Labor Code claims seeking to enforce or advance the wage order requirements and their basic workplace protections.

Because most of the statutory claims alleged here are rooted in wage order protections and requirements, the ABC test must be applied to those claims to resolve the employee vs. independent contractor issues. SGT's contention that the Supreme Court specifically approved different tests for determining employee status in the context of wage and hour litigation misses the mark. Although *Dynamex* acknowledged the possibility of a "two-test approach" to "disparate claims under different labor statutes brought by the same individual" (*Dynamex, supra,* at p. 948), the court did not suggest that a different test should apply to Labor Code claims which are either rooted in one or more wage orders, or predicated on conduct alleged to have violated a wage order. In referencing different wage and hour standards under the federal FLSA, the Court discussed "wage and hour laws" (i.e. wage and hour provisions of the Labor Code) and "wage orders" as having a singular purpose: "[T]he federal context demonstrates that California is not alone is adopting a distinct standard that provides broader coverage of

31

workers with regard to *the very fundamental protections afforded by wage and hour laws and wage orders*." (*Ibid.*, italics added.)

Indeed, not long before it issued its unanimous decision in *Dynamex*, the Supreme Court indicated its intent to apply the ABC test to a claim brought under the Labor Code aimed at addressing conduct redundant of that alleged in a wage order claim. In *Mendoza v. Nordstrom, Inc.* (2017) 2 Cal.5th 1074 (*Mendoza*), the court responded to the Ninth Circuit's request for guidance as to whether prohibitions in sections 551 and 552 against working seven days in a row should be calculated on a rolling basis, or by the workweek. (*Id.* at p. 1078.) In conducting its analysis, the Court observed that, under the applicable wage order, for purposes of calculating overtime, seven days of work was calculated on the basis of a workweek. (*Id.* at p. 1083.) The Court adopted that same understanding, *harmonizing* the meaning of a seven-day workweek for purposes of sections 551 and 552, because *"[t]he provisions of the Labor Code* are not to be construed in isolation, but in harmony *with a second set of rules governing employment . . .* [and the Court's] role in interpreting . . . wage orders and reconciling them with the Labor Code is settled." (*Id.* at pp. 1081–1082, italics added; see *Brinker, supra*, 53 Cal.4th at p. 1026 [wage and hour claims, including claims regarding the availability and timing of meal breaks, are "governed by two complementary and occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC"].)[15] "[S]tatutory purpose [is] the

---

[15] "To the extent a wage order and a statute overlap, we will seek to harmonize them, as we would with any two statutes." (*Brinker, supra*, 53 Cal.4th at p. 1027.) However, because the Legislature is the source of the IWC's authority, where there is a conflict, a provision of the Labor Code shall

touchstone for deciding whether a particular category of workers should be considered employees rather than independent contractors for purposes of social welfare legislation." (*Dynamex, supra,* 4 Cal.5th at p. 935.) In a wage and hour action where the purposes served by the Labor Code and wage order provisions are coextensive, there is no principled reason to treat the claims differently. Such a policy would create different standards for violation of the same or very similar conduct.

We conclude that the ABC test articulated in *Dynamex* applies to equivalent or overlapping non-wage order allegations arising under the Labor Code. Just as the Supreme Court in *Mendoza* sought to harmonize the calculation of seven-day workweeks between the Labor Code and wage order, the court here must harmonize and apply the same test to Gonzales's contentions that he and other class members were misclassified as independent contractors in violation of numerous Labor Code provisions.

IV.     *Remand for the Trial Court to Apply the ABC Test, as Appropriate*
        A. *Community of Interest*

SGT does not dispute the trial court's conclusion that Gonzales adequately established the elements of numerosity, ascertainability and adequacy of representation. Those issues are not before us.

On remand, the trial court will first have to determine which Labor Code claims alleged here enforce wage order requirements, and which do not. As to any Labor Code claims that do not enforce wage order requirements, the court must reevaluate the claim under the *Borello* test. As for Labor Code claims that do enforce wage order requirements, the court must analyze

_____

prevail over a wage order. (See *id.* at p. 1026; *Gerard v. Orange Coast Memorial Medical Center* (2018) 6 Cal.5th 443, 448.)

33

the claims under the ABC test. We offer the following comments on the ABC test for guidance.

As for community of interest in distinguishing "employees" from "independent contractors," the trial court on remand must examine whether common evidence will or may establish all three prongs of the ABC test: "(A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." (*Dynamex, supra,* 4 Cal.5th at p. 957.)

Specifically, as to the "A" prong of the ABC test, the question is whether drivers are free from its direction and control "both under [their contracts] for the performance of [their] work and in fact." (*Dynamex, supra,* 4 Cal.5th at p. 917.) Although the trial court was correct that Gonzales and other drivers executed varying versions of the lease agreements, on remand the trial court's focus under prong A must be not simply on the leases and their terms, but on the nature and extent of SGT's actual direction and control of the drivers. The issue is not whether Gonzales and other members of the putative class were misclassified as independent contractors. Rather, the salient inquiry is whether there is "a sufficient commonality of interest" within the proposed class (or subclasses) to permit the issue of whether SGT's drivers are employees or independent contractors "for purposes of the wage order to be litigated on a class basis." (*Dynamex,* at pp. 966–967.)

As to prong "B" of the ABC test, the trial court's focus must be on whether it may be shown by common evidence that the services performed by

34

putative class members, regardless of whether they provided traditional passenger services, or drove Access or school routes, are within the usual course of SGT's business.  (See *Dynamex, supra*, 4 Cal.5th at pp. 916-917.) We note that in *Dynamex*, the Court found the company unable to satisfy its burden under prong B as to a class composed of delivery drivers, because its entire business was to provide delivery services, and the company obtained the customers, set the delivery rates charged, told drivers where to pick up and deliver packages, and required its drivers to use its tracking and recordkeeping systems.  (*Id*. at pp. 965–966.)

Finally, as to part C of the test, the question for the trial court is whether there is sufficient common evidence that SGT's drivers are actually and "customarily engaged in an independently established trade, occupation, or business," not merely whether they could be.  (*Dynamex, supra*, 4 Cal.5th at p. 966.)

We remand this action to the trial court to conduct further proceedings as necessary to consider these issues, recognizing that the parties' arguments on the question of whether class certification was in order were not framed with the ABC test in mind, and they may have proceeded on a different evidentiary record.  As to any remaining claims that the trial court finds are governed by *Borello*, the court shall reevaluate whether its previous ruling may stand.

### B.  *Typicality*

The trial court must also reevaluate the issue of typicality.  Typicality does not require that the representative plaintiff's claims and those of the class members be identical or perfectly aligned.  (*Wersba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 228, disapproved on another ground by

35

*Hernandez v. Restoration Hardward, Inc.* (2018) 4 Cal.5th 260, 269–270.) It is enough that both the named plaintiff's claims and class members' claims arise from similar conduct and implicate the same legal theories so that the plaintiff has a motive to litigate on behalf of all class members. (See *Classen v. Weller* (1983) 145 Cal.App.3d 27, 45.) """"The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.""""" [Citation.]" (*Martinez v. Joe's Crab Shack Holdings* (2014) 231 Cal.App.4th 362, 375.)

The trial court found that Gonzales failed to satisfy the typicality requirement because he could not show he was subjected to "the same right of control by SGT" as other drivers, primarily because he claimed he was required to adhere to a work schedule, while other drivers said they were free to choose their own routes and hours. The analysis under the ABC test may alter this conclusion.

First, under the ABC test, the court examines not merely the scope of a hirer's contractual or formal right to control, but the hirer's *retention of the right* and actual exercise of its control. (*Dynamex, supra*, 4 Cal.5th at p. 955.) The trial court focused on differences between Gonzales's and other drivers' lease agreements. However, Gonzales presented evidence that, irrespective of some variation among the terms of their written agreements, SGT's drivers were not treated in markedly different respects. Further, to the extent SGT's control of drivers differed, such differences may be a function of the category of services performed by a driver at a given time. For example, while drivers who perform Access or school work may be subject to fixed schedules, routes and payment rates, and required to wear uniforms, drivers who perform

36

traditional taxicab services retain more flexibility as to their schedules and routes. To the extent such evidentiary variations are pivotal, they might be resolved, if appropriate, by redefining the subclasses.

Also, SGT maintains that Gonzales' claims are atypical because, "unlike other class members, [he] never leased a taxi during the class period." But the class allegations are not premised on having "leased" a vehicle. Rather, Gonzales seeks more generally to certify a class of plaintiffs who "were engaged by [SGT] to *drive passengers for hire*," and who "drove" for SGT during the class period, i.e., all "drivers employed by, or formerly employed by [SGT] . . . [during the class period], who were or are classified as independent contractors." The common allegations of harm suffered by Gonzales and other drivers is that all were misclassified as independent contractors. As such, they were required at their own expense to install equipment and provide tools to access SGT's dispatch system, and to obtain insurance and perform maintenance, all expenses Gonzales contends should properly be borne by their employer and were denied the benefits of wage order protections.

On remand, SGT must show that the variations in class members' factual situations are sufficiently wide to defeat class certification. For instance, regardless of a driver's status as lessee or owner/operator, drivers were charged weekly "lease" fees to perform services under the SGT umbrella. If and to the extent it is important that a driver owned rather than leased a vehicle—which may cause a variation in weekly "lease" rates, insurance, equipment installation fees, or some other business expense—such a difference would likely be a function of the damages to which an individual driver was entitled. That a calculation of individual damages will, at some point, be required does not foreclose the possibility of taking common

37

evidence on the issue of misclassification questions. (*Collins v. Rocha* (1972) 7 Cal.3d 232, 238.) The overarching inquiry is whether class members were misclassified during the class period. If so, as discussed in the overlapping analysis of commonality above, the class members are entitled to a determination as to whether SGT misclassified them as independent contractors. The fact that individual members of the class have different damages does not preclude class certification. (*Sav–On, supra*, 34 Cal.4th at pp. 329–330.)

The trial court also alluded to the fact that Gonzales could not demonstrate typicality for the entire class because he never drove LAX or school runs. However, as we have noted, typicality does not require that a class representative have suffered injuries identical to those of other class members. (*Martinez v. Joe's Crab Shack Holdings, supra,* 231 Cal.App.4th at p. 375.) Accordingly, the trial court must reevaluate whether the requirements for typicality are satisfied, and whether, given time limitations, the complaint may be amended to add an additional representative plaintiff.

C. *Determination Regarding Superiority of Proceeding as Class Action*

Finally, we recognize that, given its other conclusions, the trial court had no need to address whether class treatment would be "superior to other available methods for fairly and efficiently adjudicating the controversy." (Rule 23(b)(3); *Duran, supra*, 59 Cal.4th at p. 29.) This rule applies to class actions brought under Code of Civil Procedure section 382, as well as federal actions under Rule 23. (*Schneider v. Vennard* (1986) 183 Cal.App.3d 1340, 1345.) Thus, on remand, if the court finds the other requirements for class certification satisfied, Gonzales must also demonstrate that a class proceeding is superior to other litigation methods for the fair and efficient

adjudication of the controversies here.  (See *Sav-on, supra*, 34 Cal.4th at pp. 327, 332.)

"Although predominance of common issues is often a major factor in a certification analysis, it is not the only consideration.  In certifying a class action, the court must also conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently.  [Citation.]  '[W]hether in a given case affirmative defenses should lead a court to approve or reject certification will hinge on the manageability of any individual issues.  [Citation.]'  [Citation.]  In wage and hour cases where a party seeks class certification based on allegations that the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting.  [Citations.]" (*Duran, supra*, 59 Cal.4th at pp. 28–29.)

Previously, the trial court had no cause to determine whether Gonzales had shown that a class proceeding was superior to other adjudication methods.  But, the court did observe that, (1) SGT had presented "varied defenses, including that some drivers are subject to an arbitration agreement while others are not," (2) "credibility [issues existed among some of Gonzales'] declarants" which may result in a number of "mini trials," and (3) Gonzales did "not meaningfully specif[y] how he intends to use expert testimony."  On remand, the trial court shall consider all relevant factors to determine whether class treatment (including coordination and analysis of discovery data and a further detailed explication of plaintiffs' trial plan) would be superior to alternative methods for the fair and efficient adjudication of this controversy.  Courts "seeking to preserve efficiency and other benefits of class actions routinely fashion methods to manage individual questions[,]" and are

39

encouraged to be "procedurally innovative" to certify and manage class actions. (*Sav-On, supra*, 34 Cal.4th at p. 339; *Linder, supra*, 23 Cal.4th at p. 440 [in class actions, "trial courts must be accorded the flexibility 'to adopt innovative procedures'"].) Such innovation also permits defendants to "present their opposition, and to raise certain affirmative defenses." (*Day v. NLO* (S.D. Ohio 1994) 851 F.Supp. 869, 876.)

## DISPOSITION

The order denying the motion for class certification is reversed. The case is remanded to the trial court with the following directions. In accordance with this opinion's holdings, the trial court shall: (1) evaluate which Labor Code claims enforce wage order requirements, and which do not; (2) as to the Labor Code claims that enforce wage order requirements, apply the ABC test as described in *Dynamex* to determine whether the requirements of commonality and typicality for purposes of certification of a class action are satisfied; (3) as to the Labor Code claims that do not enforce wage order requirements, apply the *Borello* test to determine whether the requirements of commonality and typicality for purposes of certification of a class action are satisfied; (4) as to the derivative section 17200 claim, apply the ABC or *Borello* test as appropriate for the underlying alleged unfair business practice; and (5) in the event the court determines class certification is appropriate, complete the analysis by determining whether proceeding as a class action would be superior to alternative methods of adjudication.

//

//

//

//

40

Gonzales shall recover his costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, Acting P. J.


We concur:


COLLINS, J.


CURREY, J.

41